IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


RODNEY C. PARKER,
      Petitioner,

vs.                                                  Case No. 3:08cv490/MCR/EMT

EDWIN G. BUSS,[1]
      Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

     This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1).  Respondent filed a response and relevant portions of the state court record, seeking denial of the petition on grounds of procedural default (Docs. 13, 14).  The court rejected Respondent's procedural default defense and directed Respondent to file an answer to the habeas petition (Docs. 28, 29).  Respondent filed an answer addressing the merits of the petition (Doc. 31).  Petitioner filed a reply (Doc. 42).

     The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

---

[1] Edwin G. Buss succeeded Walter A. McNeil as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d)(1).

I.     BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 1 at 7–9; Doc. 14, Exhibits).[2]  Petitioner was charged in the Circuit Court for Escambia County, Florida, with one count of attempted first degree premeditated murder with a weapon (Count 1), two counts of attempted felony murder with a weapon (Counts 2 and 4), one count of attempted second degree murder with a weapon (Count 3), and one count of burglary of an occupied conveyance while armed and with an assault or battery (Count 5) (Ex. A). Following a jury trial, Petitioner was convicted of two counts of attempted second degree murder with a weapon (Counts 1 and 3) (Exs. B, C).  He was acquitted of the other charges (*id.*).  Petitioner was adjudicated guilty and sentenced on October 17, 2001, to a term of eighteen (18) years of imprisonment, with eight (8) years suspended, followed by eight (8) years of probation, with pre-sentence jail credit of one year and 124 days on Count 1 (Ex. D).  On Count 2, Petitioner was sentenced to a consecutive term of eighteen (18) years of imprisonment, with eight (8) years suspended, followed by eight (8) years of probation (*id.*).  The court stated its intent that Petitioner serve the first 10-year prison sentence with pre-sentence credit and appropriate gain time, then serve the second 10-year prison sentence with appropriate gain time, and then serve the probationary terms (*id.*).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), raising one sentencing issue (Ex. E).  The First DCA affirmed the judgment of conviction and sentence per curiam without written opinion on December 18, 2002, with the mandate issuing January 3, 2003 (Exs. G, H).  Parker v. State, 834 So. 2d 161 (Fla. 1st DCA 2002) (Table).

On June 18, 2003, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. FF).  The state circuit court denied the motion on July 31, 2003 (Ex. GG).  Petitioner did not appeal the order (*see* Doc. 13 at 3).

---

[2] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's first response to the petition (Doc. 14).

On September 18, 2003, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. I). The state circuit court appointed counsel to represent Petitioner and held two limited evidentiary hearings (Exs. K, N, Q, R). In an order rendered December 15, 2005, the state circuit court denied the Rule 3.850 motion (Ex. V). Petitioner appealed the circuit court's decision to the First DCA (Ex. Y). The appellate court affirmed per curiam without written opinion on December 20, 2006, with the mandate issuing February 20, 2007 (Exs. BB, EE). Parker v. State, 947 So. 2d 1166 (Fla. 1st DCA 2006) (Table).

While Petitioner's Rule 3.850 motion was pending, Petitioner filed a second motion to correct illegal sentence, pursuant to Rule 3.800(a) (Ex. HH). The state circuit court denied the motion in an order rendered December 15, 2005 (Ex. II). Petitioner appealed the decision to the First DCA (Ex. JJ). The appellate court affirmed per curiam without written opinion on April 26, 2006, with the mandate issuing May 23, 2006 (Ex. LL). Parker v. State, 928 So. 2d 341 (Fla. 1st DCA 2006) (Table).

On July 24, 2006, Petitioner filed a third motion to correct illegal sentence, pursuant to Rule 3.800(a) (Ex. NN). The state circuit court denied the motion in an order rendered October 11, 2006 (Ex. OO). Petitioner appealed the decision to the First DCA (Ex. RR). The appellate court affirmed per curiam without written opinion on April 9, 2007, with the mandate issuing May 8, 2007 (Exs. TT, UU). Parker v. State, 954 So. 2d 1161 (Fla. 1st DCA 2007) (Table).

On July 19, 2007, Petitioner filed a fourth motion to correct illegal sentence, pursuant to Rule 3.800(a) (Ex. VV). The state circuit court denied the motion in an order rendered October 31, 2007 (Ex. WW). Petitioner appealed the decision to the First DCA (Ex. XX). The appellate court affirmed per curiam without written opinion on July 8, 2008, with the mandate issuing August 5, 2008 (Ex. ZZ). Parker v. State, 985 So. 2d 1096 (Fla. 1st DCA 2008) (Table).

Petitioner, through counsel, filed the instant habeas action on October 24, 2008 (Doc. 1). Respondent concedes the petition is timely (Doc. 13 at 9).

## II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As

the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing

---

[3] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> legal principle from this Court's decisions but unreasonably applies that principle to
> the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" <u>Lockyer</u>, 538 U.S. at 73 (quoting <u>Williams</u>, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting <u>Williams</u>, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u>, 529 U.S. at 409. Whether a State court's decision was an

unreasonable application of legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion."  Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see, e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claim.

III.    PETITIONER'S CLAIM

Ground One: "Constitutional violation of Petitioner's right to a public trial under 6th & 14th Amendments."

Petitioner asserts that during jury selection, court security officers, acting either upon the direct order of the trial judge or with the judge's tacit approval, required Petitioner's family members and some other members of the public to leave the courtroom (Doc. 1 at 4, 10).[4] Petitioner states neither the State nor the defense requested closure of the courtroom (*id.* at 10). He further states neither party made any showing that closure was necessary, and there is no indication in the record that any family member or other person caused a disturbance or acted disorderly or that there were safety concerns at issue to justify the exclusion (*id.*). Petitioner contends the exclusion of family members and some members of the public from jury voir dire deprived him of his Sixth and Fourteenth Amendment rights to a fair and public trial and constituted structural error, pursuant to the Supreme Court's decisions in Waller v. Georgia, 467 U.S. 39, 104. S. Ct. 2210, 81 L. Ed. 2d 31 (1984) and Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) (*id.* at 4, 10–13).

Respondent concedes Petitioner presented this claim as Ground One in his Rule 3.850 motion, and he appealed the state circuit court's denial of this claim to the First DCA (Doc. 31 at 9, 20). Respondent contends Petitioner failed to demonstrate that the state court's denial of the claim was contrary to or an unreasonable application of clearly established federal law, or that it was based upon an unreasonable determination of the facts in light of the evidence (*id.* at 22–24).

---

[4] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

The state court record confirms that Petitioner raised this claim as Ground One in his Rule 3.850 motion (Ex. I at 181–89). He argued the trial court violated the Sixth Amendment by sua sponte ordering or allowing all of his family members, and family members of one of the victims, to be removed from the courtroom during jury voir dire (*id.*). Petitioner contended the Sixth Amendment right to a public trial extended to jury voir dire; therefore, the court was required to satisfy the four-part standard set forth by the Supreme Court in <u>Press-Enterprise Co.</u>, 464 U.S. at 501 and <u>Waller</u>, 467 U.S. at 39, which it failed to do (*id.* at 183–88). Petitioner further argued that pursuant to <u>Waller</u>, once a Sixth Amendment violation is established, prejudice is presumed (*id.* at 189).

The state court did not hold an evidentiary hearing on Petitioner's Sixth Amendment claim, but it held an evidentiary hearing on a related claim of ineffective assistance of counsel (based upon counsel's failure to object to the exclusion of family members from voir dire), at which evidence relevant to the Sixth Amendment issue was adduced (*see* Exs. L, Q, R). Petitioner's trial counsel, Mr. Griffith, was the only witness at the evidentiary hearing and testified as follows, in relevant part:

> Q [by Mr. Giraud, counsel for the State]. I'm going to call your attention back to—I believe it's July 16 of 2001. Were you present at a voir dire?
>
> A. If that's the correct date that the jury was selected in Mr. Parker's case, yes.
>
> Q. And during that voir dire, did there come a time when I believe court security requested or asked the defendant's family to leave the courtroom as well as the victim's family?
>
> A. I don't know if it was court security or whether it was the judge that indicated that—and I think, as I recall, it was Mr. Parker's mother and sister that were here for the voir dire selection. I don't remember if all of the other family members who were here during the trial were present for the voir dire. And I don't know if it was the Court that directed them to leave or if court security on their own asked them to leave. I don't have any recollection of that.
>
> . . . .
> Q. Do you recall how many jurors you had or approximately how full the courtroom was?

A. I do not remember. I remember I asked—my recollection—I didn't have any notes on this in my file. I believe I asked the judge if his family could stay, and she indicated that she wanted them out of the courtroom for jury selection because of the number of jurors and not wanting family members to sit next to jurors.

Q. Do you recall whether there was any other seating available in the courtroom?

A. There is the general seating for the public and where we do jurors and then there is the jury box. And, no, we didn't use the jury box. And I do not recall whether there were other trials picked that morning where other lawyers and their clients would have sat. I have no recollection if any other trials were that week or if we were the entire week.

Q. Okay. Did you object for the record concerning the closure of the courtroom?

A. I have not reviewed the transcript, but I don't believe I did. I believe that I asked Judge Nobles if his mother and sister could stay in the courtroom, and she indicated—she, being Judge Nobles, indicated she didn't want them there because of being next to potential jurors. And I do not believe that I made a formal objection on the record to that.

Q. When—you stated that the Court was concerned with family members.

A. That's correct.

Q. Do you know of anybody else that was not a juror, or a prospective juror, that was in the courtroom?

A. I don't recall that. I was—I was concerned with picking a jury, but I know that Mr. Parker said—said something to me. And, again, I don't have any notes in my file on this, but I recall he said something to me about his mother and sister being in the courtroom for jury selection, and I had asked Judge Nobles about that—and I don't believe it was on the record, I believe it was off the record—if those two could stay in the courtroom during jury selection. And my recollection is that because of the number of jurors we had, that Judge Nobles did not want his family to be in the courtroom during jury selection.

Q. But you're not aware of whether anybody else was present?

A.  I don't have any recollection of that.  When you ask me that, I'm trying to think if anybody else was present, and I don't have any recollection of that.  When I looked at my file, there was no notations [sic] of this issue at all in my file.

Q.  Did you proceed with voir dire?

A.  Obviously.

Q.  And was the defendant—was Mr. Parker allowed to assist you in voir dire?

A.  Yes.

Q.  When you pick a jury trial—or when you pick a jury and other family members sit in the courtroom, are they allowed to participate in jury selection?

A.  No.  I've never had occasion to ask that anyone participate in jury selection.

Q.  Okay.  Do you—if the family members would have been present, do you foresee that you would have picked a different jury based upon their presence in the courtroom?

A.  No.
. . . .

Q.  Now, you picked the jury.  During the trial, was the family allowed to be inside the courtroom.

A.  Yes.  He had—
. . . .

Q.  And during the trial, was that open to the public as well?

A.  The trial itself, yes.

(Ex. R at 362–66, 368–69, 372).

Mr. Griffith was cross-examined by Mr. Allred, Petitioner's post-conviction counsel:

Q .  Now, if I understand correctly, Mr. Griffith, you specifically asked Judge Nobles if the defendant's mother and sister could stay in the courtroom?

A.  That is my recollection, yes sir.

Q. And by your recollection, was there room for them to be seated without creating any kind of an issue with respect to the jury panel? The question I want to emphasize: Was there room for them to be seated without creating any kind of an issue with their contact with the jury panel?

A. They could have been seated—and I'm—as I think about this, I think we were in 406, and they could have been seated in the jury box. And, again, I don't recall whether there were any other trials that week or not; but if there were, there would have only been one or two, so there would have been room in the jury box.

(Ex. R at 373).

The judge presiding at the evidentiary hearing (who also presided at Petitioner's trial) suggested that counsel may wish to refresh Mr. Griffith's recollection by showing him a portion of the trial transcript which referenced removal of Petitioner's family from the courtroom (*id.* at 373–74). Petitioner had referenced the same portion of the trial transcript in his Rule 3.850 motion (page 7) in support of his claim (Ex. I at 182). The portion of the trial transcript evidenced the parties' discussion during a bench conference which occurred after opening statements:

THE COURT: Would counsel approach for just a moment before we begin.

(At the bench:

THE COURT: We didn't invoke the rule. Are there any witnesses in here?

MR. GRIFFITH: None of mine. I sent two of mine out—

THE COURT: Okay.

MR. GRIFFITH: — earlier, but I would move to invoke the rule at this time. Also, Judge, in invoking the rule, if you could at the end when the jurors leave, because we have family from both sides—

THE COURT: I know, they don't need to go outside and tell the others. I was going to actually ask if you want me to take the jury out for just two seconds into the other room so that I can do this. If you want to bring the witnesses in.

MS. NEEL [the prosecutor]: That's fine and swear them in. Are you going to do that now or later?

THE COURT: I'll just do each one at that time. What I can do is bring witnesses in and let them know they can't be—family members can't go outside and discuss the things with them, that this needs to be an independent step.

MR. GRIFFITH: Not only my client's family, but Ms. Workman's [a victim] family is in here.

THE COURT: I'm going to do a general to any family involved.

MR. GRIFFITH: That's what I'm saying, I think it's for everybody. Court security asked the family to leave during jury selection because there were so many people in here. They were sitting next to the jurors, so court security had them all leave during jury selection.

(Ex. B at 245–47).

At the post-convicting hearing, Mr. Allred continued his cross-examination of Mr. Griffith:

Q. Mr. Griffith, when you had this discussion with the Court and she objected, did you entertain any thought about that being erroneous?

A. Let me just—

Q. Okay.

A. Yes, but I did not make a formal objection to that.

Q. All right. What sort of error did you believe at the time this involved?

A. Keeping courtrooms open to the public.

Q. Okay. So you felt like the Court's decision had Sixth Amendment implications?

A. That is correct. I had argued that issue not with Judge Nobles, but with some other judges, and essentially it was because of the way juries are picked in Escambia County. Generally, it came up in courtrooms such as the one we're in today, where they're so small—when you have to pick a jury in here, that there is often no place to put members of the public, because in courtrooms such as this, when jurors are selected, they also put jurors in the jury box itself, and then other attorneys and clients who are picking juries sit in those four or five chairs, whatever there are, over there.

Q.  Right.  Have you also seen counsel and clients sit in this area directly in front of where the clerk sits?

A.  I have seen them stacked in this—in this particular courtroom, they've been stacked in this courtroom.

Q.  And under any of those circumstances from your prior experience, did you ever have complaints or concerns from security or from fire marshal personnel that resulted in findings by the Court that, yes, those concerns for fire and safety would require that the public be removed from the courtroom?

A.  The only knowledge I have in this courthouse of anything having to do with fire marshals is locking the doors when court proceedings are going on.

Q.  So to my question, then, your answer would be no?

A.  No.

Q.  Okay.  Now, did you—you indicated just prior that you felt like there was some Sixth Amendment implications.  Did you express, even off the record, without—regardless of whether there was a formal objection, did you indicate to Judge Nobles that you thought that that might have some Sixth Amendment implications?

A.  I have no recollection of whether I did or didn't.

Q.  Did a discussion about the Sixth Amendment even come up between you and Judge Nobles?

A.  I don't believe so, but I don't have any recollection one way or the other, Mr. Allred.

Q.  Now, was the prosecutor present for your dialogue with Judge Nobles off the record?

A.  It was Brenda Neel, and probably 75, 80 percent chance that she would have been present, unless I made an aside to the Court—an off-the-cuff statement after we had had an at bar conference or something when she was going back.

Q.  Okay.  Not really an ex parte concern, just a very casual—

A.  It would be more of just tossing something out—

(Ex. R at 377–80).

The judge asked Mr. Griffith if he remembered the removal of Petitioner's family members, and Mr. Griffith responded:

> No, I don't, because—and the reason I say that, Judge, is the issues that arose about the rule kind of overtake all of my recollections about other issues involving Mr. Parker's family and the victim's family, becuase that—for whatever reason, that's what's more in my mind when I think back on those issues.

(*id.* at 383–84).

Mr. Allred continued his cross-examination, questioning Mr. Griffith regarding whether court security asked all members of the public to leave during voir dire, or just the family members and friends of Petitioner and the victim:

> Q. . . . were you telling the Court that court security moved all of the family members and friends out of the courtroom for the victims and Mr. Parker or were you saying that there were so many people, they had all the people not necessary as participants in the trial and jury venire persons—everybody outside the group leave?
>
> A. I don't recall. All I know is that Mr. Parker's sister and mother—and I remember that specifically, because they were intimately involved in the case and were at every hearing, every—every court proceeding, and I know that they were asked to leave. And I don't remember if Mr. Parker had other family people here for the—I know they were all here for the trial after—I'm just making a distinction between the jury selection and the actual opening statements and taking testimony. I know Mr. Parker's relatives were here for opening statement and the taking of testimony. I don't recall if anyone besides his mother and sister were here for the jury selection.
>
> Q. Do you have any information to give to the Court today as to whether or not the closure of the courtroom was total or partial?
>
> A. You mean was everyone besides the prospective jurors and court personnel asked to leave? Is that what you mean by total?
>
> Q. Yeah. Besides, you know, the judge, the clerk, the court reporter, the security people—
>
> A. Everybody from the bar forward.
>
> Q. —assistance to you, Ms. Neel. Anybody beyond that left in the courtroom besides the venire panel?

A. I don't believe anyone was in the courtroom beside the venire panel. I'm trying to think how many—I'm trying to visualize how many people were in the venire panel so I can tell you if that whole segment was filled—you know, the back seats were filled up or not, and I just don't recall. I'm sure the clerk would have how many prospective jurors were called.

Q. Okay. And then by comparing those—

A. To the number of seats in the courtroom, you would know how many seats were left.

Q. Right.

A. The jury box was empty, I know that.

Q. Okay.

A. Unless there were other attorneys and defendants there.

Q. But they would not have filled up— I believe you said earlier would not have filled up all of the—

A. I would not think so.

Q. So there would be room for at least two, the mother and father—I mean, the mother and sister of Chris Parker?

A. I would believe that and for whoever else would want to sit there.

Q. Okay. Well, then why was it that—in your mind, back then, why was it an agreeable concern that the family could not—a concern of the Court that the family could not harmoniously stay in the courtroom in the jury box next to other defendants and their counsel?

A. I can't answer that.

(Ex. R at 386–89).

The judge interjected a question to Mr. Griffith:

THE COURT: . . . You stated earlier that you didn't recall them being removed during voir dire. Do you remember—I mean, did you know during voir dire that the family was not there?

THE WITNESS:  Yes, I believe I did, Judge.  I think I did, because I think it occurred when the jurors were being brought in, my best recollection.  Again, I'm not infallible on that, but I think when the jurors were being brought in, that security— and I'm basing it partially on my recollection and partially on that part of the transcript [the transcript of the bench conference after opening statements].

(Ex. R at 390–91).

Mr. Allred continued his questioning of Mr. Griffith:

Q.  Okay.  Now, in terms of your recollection of this whole issue, about 20 or 30 minutes before this hearing was scheduled to begin today, did I receive a cell phone call from you?

A.  Sure.

Q.  And during that conversation, as I was coming to the courthouse, did you indicate to me that you recalled having a discussion with Judge Nobles about the family having been asked to leave the courtroom before voir dire began?

A.  I don't know if it was before voir dire.  I remember—and I may be totally wrong, but in my own mind I remember at bar having almost—almost an off the cuff, if you would.  And I don't know if it was a conversation or a statement about the family not being in the courtroom.  And when I say off the cuff, it wasn't a formal, Judge, I object to the family being removed.  It wasn't anything formal like that.  It was more off the cuff.  And I may be absolutely wrong about that based upon what I saw on page 7 of the transcript [again, referring to the bench conference after opening statements], but somehow, in my memory, it's there, and that's—

(Ex. R at 392).

On re-direct, Mr. Giraud inquired further:

Q.  . . . just on your memory alone, do you remember whether anybody—his family members or anybody was excluded during voir dire, whether they actually came in and told them to leave?

A.  I believe—and this is four years ago, and there's nothing in my file on this issue.  I believe his mother and sister were not in the courtroom at the time the jury was selected, that was—and I can't tell you why I think that, but I think that—

Q.  Hold on, Mr. Griffith, because I've got to back up.  You're saying think, and what I'm trying to get at is whether you remember or not.

A.  I don't have a 100-percent clear memory of that.  Just like before I read this, I was certain that there was some at bar conversation with the Court about his

mother and sister sitting in for jury selection. This transcript [the transcript of the bench conference after opening statements] seems to contradict that, but that is my recollection; and whether it's right or wrong, that's my recollection.

(Ex. R at 406).

Mr. Allred followed up:

Q. Exactly why is page 7 of the motion inconsistent with your recollection of the side bar—

A. I don't know that it is. I'm just—I was telling Mr. Giraud what my recollection is. And whether it occurred or didn't occur, I can't tell you. That's my recollection of what happened. Now, whether it was at voir dire or whether it was some other time during the trial that I made a comment about it, I can't tell you.

Q. All right. So just going on the record alone, what you said that's reflected on page 7 of the motion—what you said on the record after jury selection was over and prior to the opening statements, what you said at the bottom of the page making reference to the family having been excluded during voir dire—you're not testifying that that's the first time that you raised the issue, that that—you're testifying that it's consistent with your recollection that there was an earlier discussion with the Court off the record at side bar?

A. That is my recollection. Whether it's a 100-percent accurate recollection or not, I can't tell you, but that is my recollection.

Q. Okay. And since it was not on the record, whenever it was held, there's no way to tell when it was held?

A. That is correct.

Q. It's beyond your recollection.

A. That is correct.

(Ex. R at 407–08).

The judge questioned Mr. Griffith as to whether the side bar conversation about Petitioner's mother and sister sitting in for jury selection, to which Mr. Griffith referred in his testimony, could have occurred after the bench conference reflected in the trial transcript (Ex. R at 411). Mr. Griffith responded that he did not know when it took place; he did not know if it took place during voir dire or after voir dire (*id.* at 411). He testified:

I think I made the Court aware that we—we being the defendant and I wanted his mother and sister to be able to observe the jury selection, but I can't tell you 100 percent that that occurred when they were being asked to leave or if it occurred at a later point in time. But I would not think it would have been raised or even mentioned by me at a later pont in time. I think it would have been when the jury was being brought in.

(Ex. R at 412). Mr. Griffith's testimony continued:

THE COURT: Assuming that page—the bottom of page 7 [the bench conference after opening statements] was the first time that the Court had been apprised by anyone that the family had been excluded from voir dire, would it not logically follow, then, that we would have a discussion after that time?
. . . .

MR. GRIFFITH: I would think so, Judge.

THE COURT: Well, earlier just a minute ago, you said that you would not see why it would be raised at a later date.

MR. GRIFFITH: But it apparently was if this conversation happened after the jury selection. And I don't know why it was raised.

THE COURT: Okay. If page 7 is correct, and that is the first time that the Court was advised that the folks weren't in the courtroom during voir dire, and if the bench conference between—the off-record bench conference between Ms. Neel and Mr. Griffith and you and I took place, why would you not have objected during voir dire?

MR. GRIFFITH: I don't know.
. . . .
Judge, I don't know, because I tried—as serious as this case was, I tried to object at every instance.

THE COURT: I remember.

MR. GRIFFITH: I try to object to everything, and I don't know why there wasn't an objection. Although, I know that on fundamental issues, oftentimes you don't have to object, and it may have been I was objecting so much, that—since it was a fundamental issue and I knew it would be preserved, I was just—

THE COURT: But you're just strictly speculating?

MR. GRIFFITH: Yeah. I'm trying to think why I wouldn't have on that issue, because I think I—the record is replete with me objecting.

THE COURT:  Unless you didn't know that they weren't in there.

MR. ALLRED:  I couldn't hear the last question.

THE COURT:  I said unless he didn't know [that Petitioner's family members were not in the courtroom].
. . . .

MR. GRIFFITH:  The only way that could—the only way that could have happened, Judge—and I don't know how it could have happened and me not know, because in facing the venire panel—and you don't—you're not like most judges that you take the first six and go.  You have to look at the whole panel.

THE COURT:  Correct.

MR. GRIFFITH:  And I think—and, again, I don't know that I would have seen Mr. Parker's mother and sister were not in the room, but maybe I—

THE COURT:  Would you have paid attention if they weren't in the room when you're starting to select a jury with—

MR. GRIFFITH:  I don't know.  I don't know.

THE COURT:  I mean, I don't remember how many people we had that day, but, I mean, assuming, if we filled up 407, it was 70, 80.

MR. GRIFFITH:  I think it was 406, but —

THE COURT:  Or 406, whichever room.

MR. GRIFFITH:  I don't know.  That's why I'm saying,  I just don't have any recollection of them.

THE COURT:  I understand.  And that's what I wanted to get you to testify one way or the other to.  Because you made some very affirmative statements when we started at this hearing, and then after seeing some things, your testimony has changed, understandably, because it's been a long time, but I wanted to try to get from you whether you did remember or you didn't remember.  I think I understand.

MR. GRIFFITH:  A couple of things are clear on it and some of the things aren't as clear.   And there's nothing—like I said, there's nothing in my file pertaining to the voir dire other than these are the jurors and we did the voir dire this day.  Just kind of a basic memo to the file on that, but nothing specific.

(Ex. R at 413–16).

In the state circuit court's written order denying Petitioner's Rule 3.850 motion, the court found that although Petitioner characterized the alleged courtroom closure as a "total" closure, he asserted only that members of his and one of the victim's families, not all public observers, were asked to leave the courtroom by court security during voir dire (Ex. V at 503 n.2). The court further found that the trial court never instructed court security to remove anyone from the courtroom during jury selection; therefore, there was no order that the courtroom be closed (*id.*). The court additionally rejected Petitioner's contention that Mr. Griffith's failure to object to a closure could not constitute a waiver of his Sixth Amendment right to a public trial (*id.* at 503–04).

After rendition of the state circuit court's order, Petitioner filed a pro se motion for rehearing, attaching affidavits from two family members and unverified letters from three more, stating that prior to prospective jurors entering the courtroom, court security informed the family that the trial judge wanted family members removed from the courtroom during jury selection (Ex. W). The court denied Petitioner's motion for rehearing (Ex. X). The First DCA affirmed the lower court's denial of Petitioner's Rule 3.850 motion (Ex. V).

While the First DCA's affirmance was a per curiam opinion without reasoning, this court presumes that the First DCA's decision affirms the reasoning, as well as the judgment of the circuit court. "'Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.'" Sweet v. Sec'y Dept. of Corr., 467 F.3d 1311, 1316–17 (11th Cir. 2006) (quoting Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594, 115 L. Ed. 2d 706 (1991)); *see also* Harmon v. Barton, 894 F.2d 1268, 1273 (11th Cir. 1990) (noting that the "clear inference" to be drawn from a per curiam affirmance without written opinion is that the appellate court "accepted not only the judgment but the reasoning of the trial court.").

As previously noted, in Petitioner's federal petition, he contends the state court's denial of his Sixth Amendment claim regarding the removal of his family from the courtroom during jury voir dire was contrary to or an unreasonable application of Waller, 467 U.S. at 39 (Doc. 1 at 4, 10–13; Doc. 42 at 1–7). This court must therefore first determine whether Waller clearly established the legal standard applicable to Petitioner's Sixth Amendment claim.

For purposes of § 2254(d)(1), the law is "clearly established" only when a Supreme Court holding embodies the legal principle; dicta in opinions is not controlling.  Thaler v. Haynes, — U.S. — , 130 S. Ct. 1171, 1173, 175 L. Ed. 2d 1003 (2010); Bowles v. Sec'y for Dep't of Corrs., 608 F.3d 1313, 1315 (11th Cir. 2010).  Furthermore, a federal court of appeals decision, "even a holding directly on point," cannot clearly establish federal law for § 2254 purposes.  Thaler, 130 F.3d at 1316 (citing Renico v. Lett, 130 S. Ct. 1855, 1866 (2010)).

In Waller, the Supreme Court held that the Sixth Amendment right to a public trial extends beyond the actual proof at trial and applies to pre-trial suppression hearings; therefore, prior to excluding the public, over the objection of the accused, the test set out in Press-Enterprise Co., 464 U.S. at 501, must be satisfied.  Waller, 467 U.S. at 43, 47. Press-Enterprise involved a First Amendment challenge to the complete closure to the public and press of jury voir dire in a criminal trial.  464 U.S. at 503.  The Supreme Court articulated the standard that must be applied when the trial court excludes the public from criminal trials:

> "[T]he circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one. Where . . . the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." . . . The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.  The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

Press-Enterprise Co., 464 U.S. at 509 (quoting Glove Newspaper Co. v. Superior Court, 457 U.S. 596, 606–07, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982)).

Recently, the Supreme Court analyzed whether a defendant's Sixth Amendment right to a public trial was violated when the trial court excluded, over the defendant's objection, the defendant's uncle, who was the sole courtroom observer, from voir dire.  See Presley v. Georgia, — U.S. —, 130 S. Ct. 721, 722–24, 175 L. Ed. 2d 675 (2010).  The Court held that Press-Enterprise and Waller clearly established that the Sixth Amendment right to a public trial extends to jury voir dire.  Presley, 130 S. Ct. at 723.  The Court then applied the four-part Waller standard to the facts

of the case and held that a Sixth Amendment violation occurred because there was nothing in the record showing that the trial court considered all reasonable alternatives to closure. *Id.* at 725.

In the instant case, the state circuit court found that Petitioner asserted that only a partial closure occurred, that is, particular persons (Petitioner's family members and family members of one of the victims), not all public observers, were asked to leave the courtroom (Ex. V at 503 n.2). Petitioner has failed to demonstrate, by clear and convincing evidence, that this finding, that he asserted only a partial closure, was unreasonable. The record confirms that in Petitioner's post-conviction motion, he asserted facts suggesting only a partial closure. Furthermore, the evidence adduced at the evidentiary hearing did not clearly and convincingly show a total closure. Moreover, the affidavits and letters submitted with Petitioner's motion for re-hearing suggested only a partial closure. Therefore, this court defers to the state court's finding that Petitioner asserted only a partial closure.

As previously discussed, Waller held that the four-part test set forth in Press-Enterprise applied to exclusions of all public observers over a defendant's objection. Until Presley, which was decided after the state court adjudication Petitioner's claim, the Supreme Court had not applied the Waller/Press-Enterprise test to partial closures. Indeed, prior to Presley, several of the circuit courts of appeals, including the Eleventh Circuit, did not extend the Waller standard to partial closings. *See* Douglas v. Wainwright, 739 F.2d 531, 532–33 (11th Cir. 1984) (holding that a court need not satisfy the elements of the Waller test in the event of a partial closure); *see also* United States v. Osborne, 68 F.3d 94, 98 (5th Cir. 1995); United States v. Farmer, 32 F.3d 369, 371–72 (8th Cir. 1994); Woods v. Kuhlmann, 977 F.2d 74, 76 (2d Cir. 1992); United States v. Sherlock, 962 F.2d 1349, 1357 (9th Cir. 1989); Nieto v. Sullivan, 879 F.2d 743, 753 (10th Cir. 1989). Moreover, the closure in Waller occurred over the defendant's objection; whereas, in the instant case, defense counsel did not object. For these reasons, Petitioner has failed to establish that state court's adjudication of his Sixth Amendment claim was contrary to, or involved an unreasonable application of, clearly established federal law as it existed at the time of the state court's adjudication. *See* Wright v. Van Patten, 552 U.S. 120, 125–26, 128 S. Ct. 743 (2008) (per curiam) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court 'unreasonably applied clearly established Federal law.'") (internal brackets

altered and citation omitted); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 478, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007); <u>Carey v. Musladin</u>, 549 U.S. 70, 76–77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006) (holding that even though Supreme Court decisions clearly established the test for inherent prejudice in cases involving state-actor conduct in the courtroom, a state court decision applying a different prejudice test for private-actor conduct was not contrary to or an unreasonable application of those decisions); <u>Hammond v. Hall</u>, 586 F.3d 1289, 1341 (11th Cir. 2009) (holding that because the Supreme Court has never decided whether the prejudice standard that applies when attorney error results in loss of, or interference with, a federal constitutional right or interest also applies when the loss is only of a state law right that is not congruent with federal constitutional rights or interests, the federal habeas court could not say that the state court's resolution of the issue was contrary to or an unreasonable application of clearly established federal law).

Petitioner has failed to satisfy the standard for federal habeas relief under § 2254(d). Therefore, his petition should be denied.

IV.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Edwin G. Buss is substituted for Walter A. McNeil as Respondent.

And it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 14<u>th</u> day of April 2011.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**